**Dewey C. MacKAY et al., Appellees,**

v.

**UNITED STATES of America, Appellant.**

**No. 73–1915.**

United States Court of Appeals, Tenth Circuit.

Argued July 10, 1974.

Decided Sept. 23, 1974.

Lewis, Chief Judge, and William E. Doyle, Circuit Judge, concurred in result and filed opinions.

Richard Farber, Atty., Tax Div., Dept. of Justice, Washington, D. C. (Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Bennet N. Hollander, Attys., Washington, D. C., C. Nelson Day, U. S. Atty. for the District of Utah, Salt Lake City, Utah, of counsel), for appellant.

Michael Gottfredson, Salt Lake City, Utah (Nielsen, Conder, Hansen & Henriod, and Arthur H. Nielsen, Salt Lake City, Utah, of counsel), for appellees.

Before LEWIS, Chief Judge, MOORE * and DOYLE, Circuit Judges.

MOORE, Circuit Judge:

United States of America (the government) appeals from a judgment award-

ing plaintiffs the sum of $8,669.22 plus interest allegedly erroneously assessed and collected by the government for their taxable year 1967. Jurisdiction exists through 28 U.S.C. § 1291.

No opinion was written by the court below. At the close of the testimony, the district court merely said: "The judgment in this case will be for the doctors and against the United States." Findings of Fact and Conclusions of Law were thereafter entered.

The sole issue on appeal is whether the gift by plaintiffs-taxpayers of certain notes owned by them to a hospital (a charitable organization) entitled them to a deduction as a charitable contribution upon the particular facts of this case. Consideration must primarily be given to the *bona fides* of the transaction; the circumstances and purpose under, and for, which the notes were issued; their real value; and the effect, if any, upon the financial condition of the respective donors after the alleged gift.

Taxpayers [1] (frequently referred to as "the doctors") are physicians practising in Bountiful, Utah. Prior to 1960 they, with others, desirous of having a hospital in Bountiful (the hospitals in Salt Lake City being some 20 miles distant), decided to construct a hospital. For this purpose, they formed a partnership, the South Davis Medical Center (the Center).[2] A corporation, South Davis Hospital Development, Inc. (Development), created to finance, construct and operate the hospital, was incorporated on November 23, 1960. The total construction cost was $791,158.68. By 1967 normal depreciation of $118,843.91 gave the physical plant an adjusted basis of $672,314.77. However, appraisal figures justified an appraised value in excess of $800,000 as of January 1967.

---

* Honorable Leonard P. Moore, Senior Judge, United States Court of Appeals, Second Circuit, New York, New York, sitting by designation.

1. Plaintiffs, doctors and wives, are: Dewey C. MacKay and Lorraine MacKay; W. Dean Belnap and Mary Elen Belnap; Roger A. Brown (for some reason Beverly A. Brown was not joined as a plaintiff, although she

and Roger filed a joint return); Hubert C. Burton and Elaine Burton; Lloyd R. Hicken and Alice C. Hicken; David H. Wray and Norene Wray.

2. The assets of the partnership were subsequently transferred to South Davis Medical Center, Inc., a professional corporation, incorporated, December 30, 1924.

In an attempt to gain additional backing from the community, a non-profit corporation, South Davis Community Hospital, Inc. (Community) was organized by the doctors to operate the hospital. Development then leased the hospital to Community for $6,000 a month under a 20-year lease. Prior to October 1966 these loans had not been evidenced by notes.[3]

On or about October 1, 1966, notes [4] were issued to the doctors to reflect their respective advances and, thereupon, these amounts were transferred to the notes payable ledger.

The doctors believed that it would be advantageous from their viewpoint and that of the community to transfer ownership of the hospital from Development to Community. Negotiations ensued for this purpose between representatives of both organizations. Apparently Development wanted to receive $800,000 as the purchase price. Community could pay only $675,000. To enable Community to pay the $800,000, the doctors gave to Community the notes evidencing Development's obligations to them, having a face value of $125,000, which in turn Community used as a $125,000 down payment in the purchase. The doctors then treated these transfers to Community as charitable contributions on their income tax returns.[5]

3. Over a period of some six years from 1960 to 1966, the doctors individually and through organizations in which they were partners (South Davis Investment Company, South Davis Medical Center, Inc.), had made loans to Development, the amounts thereof being in an aggregate amount in excess of $128,000. The accountant-witness stated that these advances were reflected "in the accounts payable or loans payable ledger" of Development.

4. The notes, found by the district court to reflect the amounts of the contributions were:

Dewey C. MacKay and Lorraine MacKay ................$17,251.00
W. Dean Belnap and Mary Elen Belnap ....................$17,251.00
Roger A. Brown ........................................$17,251.00
Hubert C. Burton and Elaine Burton ......................$15,870.00
Lloyd R. Hicken and Alice C. Hicken ...................$17,251.00
David H. Wray and Norene Wray .........................$17,251.00

The district court correctly listed the notes given to each of the plaintiffs in this case. However, the discrepancy between the amount itemized by the district court ($102,125) and the $125,000 figure discussed in the case is accounted for as follows:

Non-plaintiff creditors, whose notes were also given to Community, consisted of:

Thomas A. Halverson ........$ 4,875.
William S. Dunford .........$ 2,875
K. Ross Tucker .............$ 6,875
Calvin MacKay .............$ 8,250

Total .....................$22,875

plus notes issued to
       plaintiffs       $102,125

EQUALS .................$125,000

5. As a result of the disallowance of these contributions, deficiencies were assessed as follows against the plaintiffs:

Dewey C. MacKay and Lorraine MacKay ....................$1,392.04
W. Dean Belnap and Mary Elen Belnap ....................$1,559.32
Roger A. Brown .........................................$1,529.23
Hubert C. Burton and Elaine Burton .........................$1,485.35
Lloyd R. Hicken and Alice C. Hicken .........................$ 614.02
David H. Wray and Norene Wray ..........................$2,089.26

To defeat what otherwise would be a deductible charitable contribution, the government makes several unwarranted factual and legal assumptions and reaches the conclusion that the transaction was, in effect, a sham. The case, however, will not lend itself to any Procrustean treatment. The facts are undisputed and disclose that:

1. The doctors advanced over $125,000 out of their own or controlled funds to Development.

2. On October 1, 1966, these advances were evidenced by 6% notes. (No claim is made that these notes were without consideration or that they were issued as a first step in the subsequent sale.)

3. The fair market value of the notes was $125,000.

4. The sale price of the hospital demanded by Development was $800,000.

5. A fair appraisal value of the hospital was at least $800,000.

6. Community was either unwilling or unable (it matters not) to pay more than $675,000.

7. To enable Community to pay the $800,000, the doctors gave Community their $125,000 in notes for this purpose.[6]

8. After the gift the doctors no longer had any claim on Development for the payment of their notes or for the recoupment of their original advances.

The government takes an artificial seven-league step by arguing that the sale and the price was pre-arranged (as indeed it was); that the sale was in reality only for $675,000; that the contribution was "purported" and "illusory"; and that "Community, Inc., derived no economic benefit from its temporary ownership of these notes." It then makes the additional assumptions that Community would not have purchased the hospital but for the additional $125,000 contributed by the doctors and

that the gift was for the purpose of creating tax deductions for the doctors.

In making this argument, the government would appear to be transgressing its own "form over substance" theory. If it had established that the $125,000, which the doctors contributed, immediately found its way back into the doctors' own pockets, then a warning flag would definitely have been raised. However, except for the statement that the notes were used in part payment to Development, "their [the doctors] controlled corporation," there is nothing to indicate that Development was not a separate legal entity or that the doctors by a liquidating dividend or distribution of capital would have been able to recoup themselves for the full amount of their gift. Short of such proof, the transaction would seem to have been on the same footing as a gift of the notes to any charitable organization—a Salt Lake City hospital, for example.

Both parties cite many cases in support of their respective positions but it is usually the best policy not to be diverted by the different fact situations presented in such cases unless some particularly applicable principle of law may be derived therefrom. Therefore, staying within the confines of this record and looking carefully for any fraud, sham, deception or tax evasion (in contrast to proper avoidance), we find that the gift of the respective notes was an allowable deduction under the provisions of section 170, Internal Revenue Code of 1954, 26 U.S.C. § 170.

Judgment affirmed.

LEWIS, Chief Judge (concurring).

I join in affirming the judgment for the basic reasons set out by Judge MOORE but do so without the seeming ease of reasoning reflected in his opinion. However, any elaboration of the government's argumentative position leads only to the conclusion that such position rises

---

6. As Dr. Belnap testified in his deposition, the gift of the $125,000 in notes was intended to give to Community enough money to enable it to meet the $800,000 purchase price and give the doctors a charitable contribution tax benefit.

no higher than the premise, which I accept, that the late characterization of the subject monies as charitable contributions was specifically and deliberately made to obtain maximum tax benefits for the doctors. Although the amount of the purchase price was apparently molded to the situation (and the buyer perhaps surprised to find itself established as a recipient of contributions) still the procedure initially serves only to trigger the legal caution light of probing for tax evasion from the totality of the transaction. The proof of the government fails to show evasion for there is no evidence of fraud or long term basic sham or artifice. The core of the transaction is the original divestiture of $125,000 in cash by the doctors and the ultimate divestiture of these monies as completely as if traditional gifts had been made. This is tax avoidance at its best or worst.

WILLIAM E. DOYLE, Circuit Judge (concurring).

I concur in the result, but in reaching this conclusion I would stress the dearth of factual material to rebut the testimony of the appellees. Inasmuch as I do not find the case to be an open and shut one, I must express some of my reservations based on the facts.

1. The payments giving rise to the charitable deductions in question had their origin in sums advanced by the doctors to South Davis Community Hospital Development, Inc. evidenced by notes later executed and given to South Davis Community Hospital for payment of part of the purchase price of the hospital to Development. These transactions ought to be considered in light of the fact that the doctors were stockholders in the Development company.

2. The advances were made by the doctors to Development during the six years prior to 1966 and they totaled approximately $125,000, finally.

As indicated, the notes were not given at the time of the advances nor was interest paid on these advances. The records which would have indicated whether the advances were charged to the doctors' accounts had been destroyed prior to suit.

Doctors Belnap and Brown, when asked whether the advances were loans or contributions to capital, said they did not know the difference. This, notwithstanding that Dr. Brown was sophisticated, being licensed to sell and buy stock.

The notes in question were not signed as evidence of the supposed indebtedness until October 1966, just three to four months prior to the donation to Community. Counsel for the plaintiffs said that the notes were prepared in connection with negotiations for sale of the hospital by Development to Community.

3. The evidence as to the value of the notes is far from satisfactory. True, the parties testified that their notes were worth face value but they did not give any underlying reasons for these opinions.

A qualified appraiser testified that the notes were worth face value. He had been hired to appraise them for purposes of suit some three years after the notes had been donated. His appraisal was based in part on the fact that the notes were given over with full recourse and regarded the assets of the doctors as being adequate, even though he had made no investigation of their finances. Also, he was a personal friend of the doctors. But the government offered no countervailing evidence.

4. At no time during the entire history of these advances was there an effort on the part of the doctors to collect the "debts."

5. The question whether the statute of limitations had run on the underlying obligations was never inquired into. *See* Utah Code Ann. § 78–12–25 (1953).

6. The evidence as to the value of the hospital was, to say the least, weak. One of the doctors said that in his opinion it was worth about $850,000. But there is evidence that Community, the buyer, could not pay more than $675,000. One circumstance suggesting that it was

not worth anything like the sale price is that when Community was leasing the hospital from Development it had difficulty making the rental payments.

In the final analysis, my concurrence results from the fact that the government utterly failed to introduce any evidence dealing with the issues that are mentioned. It was content to put the taxpayers on their proof and to expect to discover a seam in the taxpayers' case.

In sum:

The mentioned lack of evidence on behalf of the government is a justification for the trial court's findings and judgment. I do not subscribe to giving the taxpayer the benefit of every doubt. I do not believe that the government should have a further opportunity by way of a remand. It is obligated to present its case at the trial, and where it fails to do so it is not entitled to a second go around, so to speak.